Argued May 8, peremptory writ ordered June 4, petition for
rehearing denied July 3, 1952

# STATE OF OREGON EX REL. *v.* DOBSON

245 P. 2d 903

534

*Gunther F. Krause,* of Portland, argued the cause for relator. With him on the brief were Thomas J. White, William F. White and Alex L. Parks, all of Portland.

*Donald S. Richardson* argued the cause for defendant. On the brief were Green, Richardson & Green, of Portland.

## WARNER, J.

This is an original mandamus proceeding by the state of Oregon on the relation of Tidewater-Shaver Barge Lines (hereinafter called "Tidewater") against Alfred P. Dobson, judge of the circuit court, Multnomah county, Oregon, to require that judge to assume jurisdiction of that certain suit now pending in that court wherein Tidewater, the relator here, is plaintiff and the National Organization Masters, Mates & Pilots, Local No. 17, a labor organization, Inlandboatmen's Union of the Pacific, a labor organization, and other persons, as officers and agents of said organizations, are defendants. We shall hereinafter refer to the named labor organizations collectively as the "defendant unions".

Tidewater's suit in the lower court is for the purpose of restraining the activities of the defendant unions, particularly with reference to their picketing of the premises of the Permanente Cement Company's plant in Portland (hereinafter called "Permanente") where units of Tidewater were and expect to be further engaged in the furtherance of plaintiff's business. On Tidewater's motion in the suit below for a temporary restraining order, the circuit court denied the motion on the ground that it was without jurisdiction to grant the relief sought by plaintiff for the reason that exclusive jurisdiction over the activities of the defendant unions complained of by Tidewater is vested in the National Labor Relations Board, pursuant to the pro-

visions of the federal Labor Management Relations Act, 1947, 29 USCA, § 141 et seq., sometimes called the Taft-Hartley Act and by us hereinafter referred to as the "Act of 1947". All of our references to that Act will be in terms of the section numbers accorded to its codification as it appears in the 1951 pocket part to United States Code Annotated, Title 29 (Labor).

Tidewater promptly thereafter filed its petition in this court for an alternative writ of mandamus to show cause why the Honorable Alfred P. Dobson, as judge, should not set aside the order made on Tidewater's motion and proceed with the determination of the questions presented by Tidewater's suit in the lower court. The defendant judge interposed a demurrer to the alternative writ on the grounds (1) that it appears on the face of the writ that the subject matter of the suit is vested solely in the jurisdiction of the National Labor Relations Board under the Act of 1947, and (2) that the writ does not state sufficient facts to constitute a cause of action in mandamus.

The alternative writ makes Tidewater's complaint a part thereof as reflecting "the reasons and causes" for the suit in the lower court. It also includes as an exhibit plaintiff's motion for the issuance of a temporary restraining order. The motion is based upon the provisions of § 9-401, OCLA, and plaintiff's complaint and it, in turn, has affidavits and exhibits attached, all of which are made a part thereof. One of these affidavits is that of Lew S. Russell, Jr., a director and member of the executive committee of Tidewater, and the person in charge of supervising the transportation of cement between Permanente's loading facilities in Portland and the upper points on the Columbia river. He makes a recital of the defend-

ant unions' picketing activities. The other affidavit is that of A. B. McLeod, superintendent in charge of Permanente's Portland plant. He tells of the unions' activities around the Permanente plant and the refusal of Permanente's union employees to assist in loading plaintiff's barges. Another affidavit is that of Alex L. Parks, one of Tidewater's attorneys. This relates to probable lapsed time in securing injunctive relief, if charges are made to the National Labor Relations Board by Tidewater against the defendant unions under § 158(b) (4) of the Act of 1947. The exhibits attached to the motion consist of copies of letters: one from the Central Labor Council of Portland and Vicinity to Tidewater under date of March 7, 1952; one from Tidewater to the Central Labor Council under date of March 15, 1952, in reply to the Council's aforementioned letter of March 7; and one to the defendant Inlandboatmen's Union of the Pacific under date of March 17, 1952, giving names and addresses of all plaintiff's employees coming within the scope of that union's activities.

■ The foregoing documents taken together constitute the record before us from whence we take the facts upon which we base all our conclusions hereinafter made. It is the entire record upon which the lower court predicated its ruling on Tidewater's motion. Defendants' demurrer admits the truth of the material recitals in the alternative writ. *State ex rel. v. Updegraff,* 172 Or 246, 250, 141 P2d 251; *State ex rel. v. Dobson,* 171 Or 492, 493, 135 P2d 794, 137 P2d 825. Also see *Wallace & Co. v. Ferguson,* 70 Or 306, 309, 140 P 742, 141 P 542.

Tidewater is an Oregon corporation with its principal place of business at Umatilla, Oregon, and is engaged in interstate commerce in the transportation

of commodities generally upon the Columbia river and its tributary waterways.

The defendant National Organization Masters, Mates & Pilots, Local No. 17, is a labor organization of licensed personnel employed on vessels in the navigation thereof or unlicensed masters of tugs operating upon the Columbia river and its tributaries. If we have occasion to refer to this defendant separately, it will be as Masters, Mates & Pilots. The other defendant union, the Inlandboatmen's Union of the Pacific, Columbia River Division, limits its union activities to members employed in jobs aboard vessels plying the Columbia river and other inland waterways. If necessary to make separate reference to this union, we will call it Inlandboatmen.

The employees of Tidewater employed on its vessels, as well as those engaged in loading and discharging of vessels, either do not belong to any union or are members of Columbia River Boatmen's Union, a voluntary labor organization of plaintiff's employees. This third union we will refer to as Columbia Boatmen. Tidewater alleges that it has accorded its employees wages, hours and other conditions of employment to the complete satisfaction of those employed and with the result that there is not now and has not been in the past any labor dispute of any nature between Tidewater and its employees. Tidewater has also furnished the defendant unions with the names and addresses of all its employees potentially eligible for membership in those unions. Through its brief it claims to have given agents of the defendant unions access to its employees on board its tugs for the purpose of discussing union matters.

In view of the fact that Tidewater's employees had

never chosen a representative for the purpose of collective bargaining on or prior to March 28, 1952, the Columbia Boatmen asked Tidewater to recognize it as the bargaining representative for its employees and to consent to an election to establish it, supervised by the National Labor Relations Board as such certified agent. When thus importuned, Tidewater informed the Columbia Boatmen that it would not recognize it or any other union as such representative unless it was so certified by the processes provided by the Act of 1947 and consented to such an election and at all times expressed its willingness to deal with *any* union thus chosen by its employees and certified by the National Labor Relations Board as that bargaining representative. It further affirmed its determination to remain neutral as between all unions in which its employees were members or might become members.

On March 28, 1952, the Board advised Tidewater that the Columbia Boatmen had petitioned it under the Act of 1947 for an election to determine the Columbia Boatmen as the bargaining agent for plaintiff's employees. This petition is presently docketed as Case No. 36-RC-804 and is now pending in the office of the National Labor Relations Board.

Prior to April 15, 1952, and apparently before March 7, 1952, representatives of the defendant unions approached Tidewater and demanded that it sign a labor agreement with such unions which would recognize them as the collective bargaining agents for its employees. This Tidewater refused to do. Because of this refusal, the defendant Inlandboatmen, acting through the Central Labor Council of Portland and Vicinity, with which it is an affiliate, on March 7, 1952, informed plaintiff in writing that unless it reached

an agreement with Inlandboatmen before March 17 "it would be placed on the Unfair List of Organized Labor."

Tidewater alleges that the defendant unions, in an attempt to damage and injure it and for the sole purpose of coercing and forcing it to enter into a labor agreement with the defendant unions whereby they would be named as the sole bargaining representatives of plaintiff's employees, on April 15 placed a picket line of four men at the entrance of the Permanente plant with a placard bearing an inscription as follows: "Tidewater and Shaver, Babbidge & Holt and Russell Towboat & Moorage Co., their Captains and Pilots, are non-union members of Masters, Mates & Pilots, Local No. 17''. Tidewater claims that such picketing is false and fraudulent advertising in that it misleads the public into believing that Tidewater's employees are non-union, when most of them are union, and that Tidewater is unfair to organized labor, when attempting the fullest possible neutrality under the Act of 1947:

At that time Permanente at its nearby docks in Portland was discharging or about to discharge a load of cement from one of its ships to one of Tidewater's barges for transport from that point to the upper Columbia river for government use in constructing the McNary Dam. Eleven of Permanente's employees engaged in that work at that plant are members of Warehouse Union No. 206, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, A. F. of L., also an affiliate of the Central Labor Council. Upon the appearance of the pickets, the Permanente employees refused to work in conjunction with the loading job and Permanente, to avoid a cessation of all work by its union employees, declined to

proceed with the transfer of the cement cargo to Tidewater's barges. Plaintiff claims that this action on the part of the defendant unions is causing it to lose $5,000 each day in gross revenue.

It is obvious that the sole objective of defendants' picketing, as alleged by plaintiff, is to coerce Tidewater to recognize and bargain with the defendant unions or either of them as the representatives of plaintiff's employees, notwithstanding that the National Labor Relations Board has not yet acted on the petition of the Columbia Boatmen or authorized an election for the choice of a bargaining representative.

If Tidewater would give way to the pressure thus exerted by defendants, it would be guilty of an unfair labor practice under the Act of 1947. Section 157 of this Act reads in part:

> "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing * * * and shall also have the right to refrain from any or all of such activities * * *."

Section 158(a) provides in part:

> "(a) It shall be an unfair labor practice for an employer—
> "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title * * *."

See *Midwest Piping & Supply Co., Inc., and United Steelworkers of America* (1945) 63 NLRB 1060; *Goodwin's Inc. et al v. Hagedorn et al.*, 303 NY 300, 101 NE2d 697, 699.

■■ The picketing situation projected by the conduct of the defendant unions is frequently referred to as "recognition picketing". When indulged in by a

union which cannot claim as members any of the employees of the employer against whom the picketing is directed or any authorized status as a bargaining representative, as here, it is called a "stranger union". These pharses appeal to us as appropriately definitive here.

Based upon the facts and conditions here present, our problem is to determine whether the instant recognition picketing by the "stranger" defendant unions creates a situation (1) falling within the jurisdiction of the federal government acting pursuant to the Act of 1947; and (2) if so, if it is a matter in which the federal government has such exclusive jurisdiction that courts of this state are powerless to accord any relief. It might be otherwise stated: Has the federal government so far completely entered the field of labor relations as to have pre-empted it to the exclusion of the state in matters of this kind?

Of these things we are certain: The acts of the defendant unions, as we shall hereinafter demonstrate, constitute an unfair labor practice under the Act of 1947 and may be properly denominated a "secondary boycott"; and viewed from the standpoint of Oregon law, they do not constitute a "labor dispute".

We shall first address ourselves to the matter of defendants' acts as

*Unfair Labor Practices under the Act of 1947*

As we have observed, the action of the defendant unions does not constitute a "labor dispute" as defined by § 102-925(3), OCLA, so as to inhibit the use of the injunctive process under the provisions of § 102-916, OCLA, unless it can be said that the action of the defendant unions here is a matter for the exclusive jurisdiction of the National Labor Relations Board.

The most that can here be claimed as a labor dispute is such·as may exist between the defendant unions and the Columbia Boatmen in their respective striving to become the official bargaining representative of plaintiff's employees. Tidewater is not a party to it and, to the contrary, has evinced a desire and determination to deal with whatever union may be chosen by its employees as their representative through the processes provided by the Act of 1947. Plaintiff's position is one of proper neutrality mandated by that Act.

It may be timely to here record that a "labor dispute" in terms of federal law is defined by § 152(9) as follows:

> "The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee."

We glean the following facts from the record before us. The Permanente Cement Company has loading facilities in Portland from which it transfers its products to barges of Tidewater for transshipment to points on the upper Columbia river. One of the most important is to the McNary Dam, where great quantities of its cement are now being consumed in the construction of that federal enterprise of gigantic proportions. Plaintiff is a common carrier engaged in interstate commerce in transporting such commodities by its vessels operating upon the Columbia river and its tributary waters. All of its vessels engaged in such commerce are manned by employees of plaintiff.

In its complaint Tidewater makes the following forthright statement concerning the acts and resultant status of the defendant unions under the Act of 1947:

"That the picketing and other action of defendants against plaintiff for the purpose of coercing plaintiff to sign an agreement and recognize defendants as the collective bargaining agent for plaintiff's employees is not only unlawful *but is a deliberate unfair and illegal labor practice* designed to interfere and obstruct a free and voluntary selection of a collective bargaining agent by plaintiff's employees *in violation of the Labor Management Relations Act of 1947* * * *." (Italics ours.)

However, in plaintiff's brief we find a reversal of its position as disclosed by its complaint. In its brief it says:

"The type of picketing with which TIDEWATER is confronted is not such as to constitute an unfair labor practice under Sec. 8(b) of the Taft-Hartley Act * * *."

This is followed by citations to authorities in an attempt to sustain the latter position. Notwithstanding that Tidewater here presents a theory which was apparently not argued before the lower court, we will give some attention later to the authorities which it cites in support of this last thesis, in connection with our discussion of the defendant unions' argument of the same tenor.

If we take notice of plaintiff's allegations reflected by its complaint, it claims that notwithstanding that the acts of the defendant unions constitute an unfair labor practice proscribed by the Act of 1947, the National Labor Relations Board does not have exclusive jurisdiction and that a concurrent right to restrain the actions of the unions reposes in the courts of this state.

On the other hand, the defendants contend that their acts do not constitute unfair labor practices, that they are made permissible under the Act of 1947, and that the Act has so completely pre-empted the field of labor relations that the state cannot exercise any jurisdiction or authority in the premises. If we accept the premise to which Tidewater shifts in its brief, then plaintiff is in partial accord with the defendant unions to the extent that the acts of the defendants are permissible under the Act of 1947. In their respective arguments, both take the position that the acts of the defendant unions constitute a "primary strike" and, therefore, are not amenable to the Act of 1947.

■ Neither the postulate of plaintiff nor that of the defendant unions completely accords with our view. It is sufficient at this point to say that in our opinion, limited as it must necessarily be to the record before us, the acts of the defendant unions as outlined above do constitute an unfair labor practice under the Act of 1947.

Section 158 of the Act of 1947 defines unfair labor practices. Subsection (b) declares what acts constitute an unfair labor practice on the part of a "labor organization or its agents." The pertinent parts are:

"(b) It shall be an unfair labor practice for a labor organization or its agents—
" * * * * * *

"(4) to engage in, or to induce or encourage *the employees of any employer* to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer * * * to cease doing business with

any other person; (B) forcing or requiring *any other employer* to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title * * *." (Italics ours.)

Referring to the record before us once again and resolving it in terms of the foregoing prohibited practices defined by § 158, we find that defendant unions are engaged in a practice designed to induce or encourage the employees of Permanente to engage in a strike or concerted refusal in the course of their employment to transport or otherwise handle the commodities of Permanente or perform any services for Permanente with reference thereto with the object of forcing or requiring Permanente to cease doing business with plaintiff, or to force or require Tidewater to recognize and bargain with the defendant unions as the bargaining representatives of Tidewater's employees, and at a time when the defendant unions have not been certified as the representatives of plaintiff's employees under the provisions of § 159 of the Act of 1947. The result was a *concerted* refusal of Permanente's employees to load Tidewater's barges, coupled with a refusal on the part of Permanente (the other employer) to proceed otherwise with the current loading.

This conclusion rests upon § 158(b) (4) (B) of the Act and the construction given by *International Brotherhood of Electrical Workers et al. v. NLRB* (1951) 341 US 694, 95 L ed 1299, 71 Sup Ct 954, hereinafter called the Connecticut case, and *NLRB v. Denver Building & Construction Trades Council et al.* (1951) 341 US 675, 95 L ed 1284, 71 Sup Ct 943, hereinafter called the Denver case. The Connecticut case was an

affirmation of a decision by Judge Learned Hand (181 F2d 34, 37) who there defined a secondary boycott as follows:

" * * * The gravemen [sic] of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no. concern in it. Its aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employees' demands * * *."

In Rothenberg, Labor Relations, 462, this pertinent observation is made concerning the question of secondary boycotts arising under § 158(b) (4):

" * * * It is sufficient to subject the labor organization to action if it or its agents *'induce* or *encourage'* the employees of *any* employer to commit or participate in any of the prohibited activities. By clear implication privity of labor relations between the labor organization and the employer is excluded as a test of the labor organization's liability. The *purpose* of the complained conduct, rather than privity of labor relations, is established as the standard for measuring amenability to action.

"Where the complaint· consists not of union participation in the illegal activities, but, rather, arises from the labor organization's 'encouragement' or 'inducement' of an employer's workingmen to engage in activities for the proscribed purposes, the union's liability depends on whether or not the persons whom it is charged with 'encouraging' or 'inducing' occupy the status of 'employees' * * *."

Defendants, to the contrary, argue that their activities are permitted and protected under the Act of 1947 and cite in support *Sailors' Union of the Pacific, AFL,* and *Moore Dry Dock Company,* 92 NLRB 547; *Perry Norvell Company and United Shoe Workers of*

*America, CIO, et al.,* 80 NLRB 225; and *NLRB v. International Rice Milling Co., Inc.* (1951) 341 US 665, 95 L ed 1277, 71 Sup Ct 961.

The Rice Milling Company, the Denver and the Connecticut cases were all argued before the court at the same time as involving illegal labor practices under § 158(b) (4). In the Rice Milling Company case, the rice mill employed non-union employees. The union there was engaged in a recognition picketing of the employer's mill premises. No mill employees were in the picket line. While this was in progress, a truck of a neutral customer of the mill, with two of the customer's employees, drove up to obtain an order of bran and rice for their employer. The pickets intercepted it and, in response to the urgings of the union pickets, it turned back and stopped on the highway. At that juncture, an officer of the Rice Milling Company came out, boarded the truck and, with one of the customer's employees, drove the truck via a detour into the mill. The pickets ran toward it and threw stones at it. The court concluded (341 US 670):

> "A sufficient answer to this claimed violation of the section [§ 158(b) (4)] is that the union's picketing and its encouragement of the men on the truck did not amount to such an inducement or encouragement to 'concerted' activity as the section proscribes. While each case must be considered in the light of its surrounding circumstances, yet the applicable proscriptions of § 8(b) (4) are expressly limited to the inducement or encouragement of *concerted* conduct by the employees of the neutral employer * * *."

The court continues (341 US 671):

> "* * * That language contemplates inducement or encouragement to some concert of action *greater than is evidenced by the pickets' request*

*to a driver of a single truck to discontinue a pending trip to a picketed mill.* There was no attempt by the union to induce any action by the employees of the neutral customer which would be more widespread than that already described. There were no inducements or encouragements applied elsewhere than on the picket line. The limitation of the complaint to an incident in the geographically restricted area near the mill is significant, although not necessarily conclusive. The picketing was directed at the Kaplan employees and at their employer in a manner traditional in labor disputes. Clearly, that, in itself, was not proscribed by § 8(b) (4). *Insofar as the union's efforts were directed beyond that and toward the employees of anyone other than Kaplan,* there is no suggestion that the union sought *concerted* conduct by such other employees. Such efforts also fall short of the proscriptions in § 8(b) (4) * * *." (Italics ours.)

Defendants particularly rely upon that part of the Rice Milling Company case reading (341 US 672): "That Congress did not seek, by § 8(b) (4), to interfere with the ordinary strike has been indicated recently by this Court", citing *International Union of United Automobile, etc. Workers of America, CIO et al. v. O'Brien et al.,* 339 US 454, 457, 94 L ed 978, 70 Sup Ct 781, and claiming that "This is emphasized in § 13 * * *."

The interference with the driver of the Rice Milling Company's neutral customer's truck may not constitute a violation of § 158(b) (4) and properly fall in the category of an "ordinary strike", but in the Denver and Connecticut cases decided the same day as the Rice Milling Company case, we find a set of facts comparable to the situation presented here. In both of those cases, the union picketed the construction undertaken by general contractors employing directly union-member employees. Each general contractor had, however, subcontracted portions of the work to

other contractors employing non-union labor. In both instances the union picketed the construction work. This resulted in the employees of each general contractor abandoning the job and ultimately in the displacement of each subcontractor and his replacement with a different subcontractor employing union help. The court in both cases held that the actions of the respective picketing unions constituted unfair trade practices under § 158(b) (4).

The Denver case clearly distinguishes the Rice Milling Company case (which immediately precedes it in the reports) and reads (341 US 687):

"A. We must first determine whether the strike in this case had a proscribed object. The conduct which the Board here condemned is readily distinguishable from that which it declined to condemn in the Rice Milling case, *ante,* p. 665. There the accused union sought merely to obtain its own recognition by the operator of a mill, and the union's pickets near the mill sought to influence two employees of a customer of the mill not to cross the picket line. In that case we supported the Board in its conclusion that such conduct was no more than was traditional and permissible in a primary strike. The union did not engage in a strike against the customer. *It did not encourage concerted action by the customer's employees to force the customer to boycott the mill.* It did not commit any unfair labor practice proscribed by § 8(b) (4).

"In the background of the instant case there was a longstanding labor dispute between the Council and Gould & Preisner [the subcontractor] due to the latter's practice of employing nonunion workmen on construction jobs in Denver. The respondent labor organizations contend that they engaged in a primary dispute with Doose & Lintner [the general contractor] alone, and that they sought simply to force Doose & Lintner to make the project

an all-union job. If there had been no contract between Doose & Lintner and Gould & Preisner there might be substance in their contention that the dispute involved no boycott. If, for example, Doose & Lintner had been doing all the electrical work on this project through its own nonunion employees, it could have replaced them with union men and thus disposed of the dispute. However, the existence of the Gould & Preisner subcontract presented a materially different situation. The nonunion employees were employees of Gould & Preisner. The only way that respondents could attain their purpose was to force Gould & Preisner itself off the job. This, in turn, could be done only through Doose & Lintner's termination of Gould & Preisner's subcontract. The result is that the Council's strike, in order to attain its ultimate purpose, must have included among its objects that of forcing Doose & Lintner to terminate that subcontract. On that point, the Board adopted the following finding:

" 'That *an* object, if not the only object, of what transpired with respect to . . . Doose & Lintner was to force or require them to cease doing business with Gould & Preisner seems scarcely open to question, in view of all of the facts. And it is clear at least as to Doose & Lintner, that that purpose was achieved.' (Emphasis supplied.) 82 N.L.R.B. at 1212.

"We accept this crucial finding. It was an object of the strike to force the contractor to terminate Gould & Preisner's subcontract.

"B. We hold also that a strike with such an object was an unfair labor practice within the meaning of § 8(b) (4) (A)." (Italics ours.)

The Moore Dry Dock Company case, supra, (92 NLRB 547) and the Perry Norvell Company case, supra, (80 NLRB 225) also cited by the defendant unions, must yield before the later cases of the United States Supreme Court. Moreover, we are persuaded

that they are readily distinguishable from the instant matter on the facts.

The Moore Dry Dock Company case compels analysis, inasmuch as it is a decision relied upon both by plaintiff and defendants as authority for their common contention, made through the avenue of their respective briefs and made here by Tidewater for the first time, that the acts of the defendant unions are permissible under the Act of 1947.

The facts in the Moore Company case have much in common with the instant matter up to a certain point. Samsoc, as the owner of the S. S. Phopho, had entrusted that vessel to the Moore Company at its shipyard at Oakland, California, in November, 1950, for the purpose of converting it into a bulk carrier of gypsum. The contract between the owner and the Moore Company provided that " 'During the last two weeks [of the work by Moore] * * * [the Phopho's] Owner shall have the right to put a crew on board the vessel for training purposes, provided, however, that such crew shall not interfere in any way with the work of conversion." (92 NLRB 551.) The picketing of the entrance to the Moore Company plant began February 17, 1950, shortly after Samsoc had availed itself of the contract privilege to train the Phopho crew and make preparations for the ship's initial journey. The crew was obtained by Samsoc in New York and placed aboard the Phopho while yet in the yard of the Moore Company. The Samsoc crew commenced work as soon as aboard, painting and cleaning the vessel and otherwise getting it ready for the sea. The dispute between Samsoc and the union was predicated upon the hiring of Greek nationals for a crew, thereby displacing American seamen. On February 21, 1950, the unionized employees of the Moore Company

ceased work aboard the Phopho but otherwise continued work in their regular manner for the Moore Company throughout the course of the picketing.

The question before the National Labor Relations Board in the Moore Company case was whether or not the picketing constituted a primary strike against Samsoc or was a secondary boycott against the Moore Company. It was held, with two members dissenting, that the strike was primary against the owner of the vessel. The majority predicated its judgment upon the conclusion that the situs of the strike was ambulatory and that while the owner's ship was at the Moore dock with the owner's crew aboard, the primary strike situs was at the Moore Company dock, thereby giving the union picketing the status of a primary action instead of a secondary boycott. In so doing the Board said (92 NLRB 549):

> " * * * picketing of the premises of a secondary employer is primary if it meets the following conditions: (a) The picketing is strictly limited to times when the *situs* of dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the *situs*; (c) the picketing is limited to places reasonably close to the location of the *situs*; and (d) the picketing discloses clearly that the dispute is with the primary employer * * * "

These criteria of the Board were approved in *NLRB v. Service Trade Chauffeurs, Salesmen & Helpers, Local 145 et al.*, 191 F2d 65, 68. In explaining their application in the Moore Company case, the Board also said (92 NLRB 551):

> " * * * We are not holding, as the dissenters seem to think, that a union which has a dispute with a shipowner over working conditions of sea-

men aboard a ship may lawfully picket the premises of an independent shipyard to which the shipowner has delivered his vessel for overhaul and repair. We are only holding that, if a shipyard permits the owner of a vessel to use its dock *for the purpose of readying the ship for its regular voyage by hiring and training a crew and putting stores aboard ship,* a union representing seamen may then, within the careful limitations laid down in this decision, lawfully picket in front of the shipyard premises to advertise its dispute with the shipowner.'' (Italics ours.)

Additional language of the majority opinion of the Board which further distinguishes it from the instant matter reads (92 NLRB 551):

"Samsoc * * * availed itself of this contract privilege [i.e., to put a crew aboard during the last two weeks]. When it did, Moore [the secondary employer] and Samsoc [the primary employer] were *simultaneously engaged in their separate businesses* in the Moore yard." (Italics ours.)

Indeed, the opinion is made to turn upon this duality of interest.

Here, plaintiff's vessel was at Permanente's plant in the furtherance of Tidewater's business in an enterprise in which plaintiff and Permanente had a common interest and in which their respective employees, had it not been for the picketing by the defendant unions, would have necessarily served together to accomplish.

We find it difficult to see any difference in principle between the activities of Permanente and Tidewater and their respective employees and the activities of the general contractors and subcontractors and their respective employees as recited in the Denver (341 US 675) and Connecticut (341 US 694) cases. There the general contractors were the secondary employers and the subcontractors were the non-union

primary employers, and the general contractors and the subcontractors were laboring together at a common situs to complete one enterprise for a third party which required their united efforts. Even though both general contractors and subcontractors were, as to their respective employees, independent contractors, the ultimate and contemplated benefit of their joint efforts could not be conferred upon a third party until they had completed their respective contributions to the common objective.

In the instant matter, Permanente had undertaken to complete delivery of its product to a third party on the upper Columbia river, the first step of which required the discharge of its cement from its ship into Tidewater's barges, an act which in and of itself required the commingled efforts of the respective employees of Permanente and Tidewater, and from whence no third party on the upper river would receive the benefit until fully completed by both of them acting in concert and not, as said in the Moore Company case, as a result of simultaneous engagements "in their separate businesses" for their separate ends. In the Moore Company case, either the Moore employees or the Samsoc crew could have ceased its respective employment on the S. S. Phopho for its respective employer without necessitating a delay or interference with the work of the other. In the case at bar, a concerted cessation of Permanente's employees or a concerted cessation of Tidewater's employees would unavoidably work a cessation of the other and at least a temporary abandonment of the common enterprise in which both employers had a common interest to complete. In the Moore Company case two separate and unrelated jobs were under way. In this case only one common job was claiming the

attention of the two employers. So, too, is it in the Denver and Connecticut cases which we think decisively determine here that the defendant unions' activities are a secondary boycott and not a primary strike.

There is yet another important factor which distinguishes the Moore Company case from the case at bar. There the dispute between Samsoc and the picketing union was limited to one matter and to a small segment of Samsoc's employees, that is, only the Greek crewmen who replaced American seamen on the Phopho. It was not a phase of a larger labor dispute. It was the only dispute with the ship owner. Samsoc was engaged in operating tramp ships in world-wide trade. It has " * * * no office, pier, or other place of business in the State of California, nor, so far as the record discloses, elsewhere in the United States * * *." (92 NLRB 558.) As was said in the Moore Company case (92 NLRB 549): "In the usual case, the *situs* of a labor dispute is the premises of the primary employer. Picketing of the premises is also picketing of the *situs* * * *." Here the dispute between the plaintiff Tidewater and the offending unions relates to *all* of Tidewater's employees regardless of which of plaintiff's many boats and barges they are employed upon. This does not concern a particular group of plaintiff's employees upon a particular boat, as was the status of the crewmen on the S. S. Phopho. Moreover, unlike Samsoc, owner of the Phopho, which had no place of business in California or in the United States, Tidewater maintains its principal place of business in Umatilla, Oregon, and that place is the situs of the dispute between the unions and Tidewater. Under those circumstances, the union, by extending its picket line to the premises

of other employers and thus abandoning the scene of its actual dispute with the primary employer, went beyond the protected area of primary picketing. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, etc. and Schultz Refrigerated Service, Inc. (1949) 87 NLRB 502, 506.

In further support of its contention that the acts of the defendant unions do not fall within the scope of the Act of 1947, plaintiff quotes from § 158(b) and (c) of that Act. Although unexplained, it is no doubt prompted to cite § 158(c) because of the reference made to it in the memorandum opinion of the judge of the circuit court for Multnomah county in the recently pending case in that court entitled *Oliver J. Olson & Co. v. National Union of Marine Cooks & Stewards,* etc., and cited elsewhere in plaintiff's brief. That case is very similar to the instant case in its facts. It was a suit seeking injunctive relief, as here. In the Olson case, however, there was no challenge to the court's jurisdiction and a temporary injunction was granted. At this point it is necessary to refer only to what is said therein concerning § 158(c) of the Act of 1947. The opinion of the lower court in the Olson case reads:

"If the picketing in question constituted an unfair labor practice under the Labor-Management Act, U.S.C. 29: 158, this Court would be powerless to restrain it and the remedy of the plaintiff would be a petition to the NLRB which could enforce its order made thereon by proceedings in the Court of Appeals for the Ninth Circuit, U.S.C. 29: 160. *But peaceful picketing is eliminated as a possible unfair labor practice by Section 158c of that act.* The powers and duties of the NLRB are limited to dealing with representation and unfair labor practices

and to inquisitorial powers with respect to them * * *." (Italics ours.)

■ Section 158(c), sometimes referred to as the "freedom of speech" section, provides:

"The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

This section was not designed to protect acts which are otherwise unlawful. It does not create an asylum of immunity for either employer or employee from the ban on coercive acts created by the preceding provisions of § 158, i.e., subparagraphs (a) and (b). Any doubt in this respect is set at rest by *International Brotherhood of Electrical Workers et al. v. NLRB,* supra, 341 US 694, where the construction accorded to § 158(c) by the circuit court in the Olson case and implied by the plaintiff here was directly before the court. The Supreme Court said at page 704:

"The remedial function of § 8(c) is to protect noncoercive speech by employer and labor organization alike in furtherance of a lawful object. It serves that purpose adequately without extending its protection to speech or picketing in furtherance of unfair labor practices such as are defined in § 8(b) (4). The general terms of § 8(c) appropriately give way to the specific provisions of § 8(b) (4)."

Also see *NLRB v. Service Trade Chauffeurs, Salesmen & Helpers, Local 145 et al.,* supra, 191 F2d 65, 66.

The problem presented by the instant matter does not find complete solution in our holding that the acts of the defendant unions, as reflected by the record

before us, constitute an illegal labor practice under § 158 of the Act of 1947. If it were not for the facts to which we hereinafter allude, we would be compelled to rest our opinion at this point and refuse to issue the requested writ. The presence of these facts which in substance bespeak the existence of a declaration by the National Labor Relations Board to render dormant and unexercised certain powers which have been delegated to it under the Act of 1947, thereby rendering that Act remedially innocuous as to plaintiff, compels further inquiry to determine whether the acts of the defendant unions are or are

### Not a Labor Dispute under Oregon Law

If they do not constitute a labor dispute under Oregon law, then the state of Oregon, in the absence of a present and efficient remedy under the federal Act, can and should promptly and efficiently protect against violations of its own public policy in the interest of the citizens of this state. *Peters v. Central Labor Council,* 179 Or 1, 169 P2d 870.

We must first determine whether or not the lower court has jurisdiction to enjoin the acts of the defendant unions notwithstanding the provisions of the Little Norris-LaGuardia Act of the state of Oregon. This is comprehended in § 102-916, OCLA, and reads as follows:

> "No court, nor any judge or judges thereof, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of this act  *  *  *."

This necessitates deciding whether or not the picketing of Permanente's Portland plant is in furtherance

of a labor dispute. If it is, then it follows that Tidewater would not be entitled to an injunction, notwithstanding the inaction of the National Labor Relations Board.

A "labor dispute", as defined by Oregon's Little Norris-LaGuardia Act (§ 102-925(3), OCLA), is as follows:

"The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employe."

In *Markham & Callow, Inc. v. International Woodworkers et al.,* 170 Or 517, 564, 135 P2d 727, we had occasion to refer to the public policy of this state, as expressed in § 102-913, OCLA, in these words:

"* * * The public policy applicable to the construction of the act is clearly stated in O. C. L. A. 102-913, where it is declared that

" 'It is necessary that he [the worker] have full freedom of association, self-organization and designation of representatives of his own choosing to negotiate the terms and conditions of his employment * * *.'

"To what purpose is this legislative declaration of policy if the performance of a contract which embodies the 'terms and conditions of his employment' and which was negotiated by 'representatives of his own choosing' may be obstructed by picketing and if the very statute which was intended to foster collective bargaining is to be construed as preventing equity from protecting the very objectives for the attainment of which the statute was enacted?"

There is no contract outstanding between plaintiff and either of the defendant unions. The defendant unions are each striving to become the sole bargaining representative of Tidewater's employees. A substantial number of plaintiff's employees, as we have before stated, had, before the institution of plaintiff's suit and, indeed, before the time the defendant unions began to picket the Permanente plant, filed a petition with the National Labor Relations Board requesting an election for the selection of the Columbia Boatmen as their bargaining representative. No action has yet been taken by the Board on the pending petition. Notwithstanding this, the defendant unions commenced to picket the Permanente plant because of the presence of one of Tidewater's barges at the Permanente plant ready to receive a cargo of Permanente's cement. The obvious purpose of this picketing is to force Tidewater to enter into a direct contract with the defendants whereby they would become the bargaining representatives for plaintiff's employees, not one of whom is known to be a member of the defendant unions.

■■ A labor dispute which will prevent an injunction exists where a union seeks by picketing an employer's plant to force an employer to require his employees to join the union so that the union can become the exclusive bargaining agent for the employer (*Baker Hotel v. Employees Local 161*, 187 Or. 58, 74, 207 P2d 1129) or where two or more unions each seek exclusive bargaining rights and where there has been no certification by the National Labor Relations Board and one of the unions pickets the employer's plant. *Fur Workers Union, Local No. 72 et al. v. Fur Workers Union et al.*, 105 F2d 1 (AppDC). One of the most important factors which distinguishes the case at bar on its facts from the cases last cited is that in the

instant matter a petition was filed and pending before the National Labor Relations Board before the institution of the picketing by the defendant unions. *Stone Logging Co. v. International Woodworkers et al.,* 171 Or 13, 135 P2d 759, and *Markham & Callow, Inc. v. International. Woodworkers et al.,* supra, illustrate the significant importance of jurisdiction taken under the Act of 1947. Other distinctions are that in the Baker Hotel and the Fur Workers Union cases, the union was picketing the employer's principal place of business, in short was conducting a permissible primary strike instead of a secondary boycott on the premises of another employer, as is apparent here, and that the acts of the defendant unions here have the impress of illegality under the federal Act of 1947. In the Baker Hotel case the complaint confessed that a labor dispute existed between the employer and its employees.

In the Stone case there had been no certification of a bargaining representative, and the court's opinion in that case indicates that no proceedings for certification were pending, a basic distinction which is pointed out in the latter opinion. In the Markham case an injunction was upheld on the ground that no labor dispute existed and that the picketing was for the unlawful purpose of forcing a breach of the existing contract between the employer and the union which was the authorized bargaining representative for its employees. In the Stone case the injunction was denied on the ground that a labor dispute existed in the absence of a valid contract with the certified union. At the time of the decisions in the Markham and Stone cases, the National Labor Relations Act, as it then existed, had not been amended by the Taft-Hartley Act of 1947, which created for the first time illegal

labor practices on the part of the union (§ 158(b) (4) of the Act of 1947), and the offending union was not guilty of an illegal labor practice under the federal Act as are the defendant unions here.

In the Stone case (171 Or 13, 21) we pointed out the chief distinction between that case and the Markham case (170 Or 517) in the following words:

"* * * The chief distinction lies in the fact that in the Markham & Callow case the union acting as exclusive bargaining agency for all of the employees and which as such secured the union shop contract had been certified as the exclusive representative of all of the employees for the purposes of collective bargaining by the National Labor Relations Board pursuant to an election conducted by that board. In the case at bar, on the other hand, the plaintiff comes before the court without the benefit of any certification * * *."

In so saying, we did not mean thereby to convey the idea that the presence of a bargaining agent certified by the National Labor Relations Board was an essential element to strip the controversy of the character of a "labor dispute" under the Oregon law. There, reference to the presence of a certified bargaining representative was a convenient and convincing token with which to demonstrate that all had been done that then could be done to sustain a proper legal labor relationship between the employer and its employees under the National Labor Relations Act in the avoidance of a labor dispute.

Although no bargaining agent has yet been certified by the National Labor Relations Board for Tidewater's employees, we find that the action of the Columbia Boatmen on March 28, 1952, in petitioning the Board through its regional office in Portland to hold an election for the purpose of determining whether that

union should be certified as a representative of plaintiff's employees and Tidewater's assurances of neutrality and willingness to bargain with any union so certified, is evidence that all has been done up to this time that properly could be done to sustain a proper legal labor relationship between Tidewater and its employees under the Act of 1947 in the avoidance of a labor dispute between plaintiff and those who work for it. Having thus made the labor relations between Tidewater and its employees a subject for the jurisdiction of the National Labor Relations Board, there is nothing further that can be done by it at this time within the boundaries of the Act of 1947 except to await the Board's action in response to the petition now pending before it. Such a situation, in our opinion, places Tidewater on a parity with Markham & Callow, so far as their relations to the National Labor Relations Board are concerned, when considering its relationship to the picketing union.

In neither the Markham case nor the Stone case was this court called upon to pass on a state of facts revealing that proceedings were pending before the National Labor Relations Board for an election which had not been implemented nor a certification of a bargaining agent not yet completed. This projects the unique situation which we have now to consider in further determination of whether or not the action of the defendant unions constitutes a labor dispute under the Oregon law.

*Union Premier Food Stores, Inc. et al. v. Retail Food Clerks and Managers Union et al.*, 98 F2d 821 (3d cir.), cited by us with approval in the Markham case, has many characteristics akin to the fundamental features of the matter before us. In that case the

plaintiff employers were engaged in interstate commerce and sought an injunction against four A. F. of L. unions to restrain picketing. The A. F. of L. and C. I. O. unions were engaged in a conflict concerning representation, each side asserting the right to represent the employees of the plaintiffs as their sole bargaining agent under an exclusive collective bargaining contract. The plaintiff employers maintained neutrality, as here, and suggested that the two unions try to organize the employees, assuring them of freedom to distribute their literature and talk to and persuade them. The plaintiffs also suggested that after effecting such contracts, an election be held and gave assurances that the plaintiff stores would sign a contract with whichever union obtained a majority. One union agreed, but the defendant union refused to do so and advised that it would not withdraw its picket line until plaintiffs entered into a union agreement with it. The plaintiffs thereupon agreed to enter into negotiations for a contract with the defendant union. The other union, known in that case as "United", thereupon filed a complaint with the National Labor Relations Board charging the plaintiff employers with unfair labor practices. This was followed by a preliminary hearing in the office of the Board, at which time the interested parties discussed an election. The Board wrote the plaintiffs advising that the matter was being forwarded to its office in Washington for disposition; but before further action by the Board, the defendant union again placed its pickets at plaintiffs' plant, whereupon plaintiffs filed their bill for injunction in the United States district court. Their petition for injunction was granted. In upholding the injunction the court said (98 F2d 825-6):

"The fundamental question here, as stated

above, is whether or not under the facts of this case there was a labor dispute involving the plaintiffs within the meaning of the Wagner Act. Of course there was a 'labor dispute' or the Board could not have taken jurisdiction and proceeded to determine the question in issue, but the dispute was and is entirely between the unions. The plaintiffs are not disputing with anyone.

" * * * * * *

"The only controversy in this case concerns the right to represent plaintiffs' employees as collective bargaining agent and that is a real controversy, but it is between the affiliates of the C. I. O. and of the American Federation of Labor * * *.

" * * * * * *

"The unions are the 'disputants' and as to this dispute they do not now stand in 'proximate' or other relation to the plaintiffs or their employees within the meaning of the Wagner Act. *Congress meant to help both capital and labor by the passage of this Act and when the Board has taken jurisdiction and is determining the only question in dispute between the unions, it did not intend to destroy the great business of any employer who stands willing and ready to obey any and all provisions of the Act as soon as told by the Board what to do.*

" * * * * * *

"Since there was no 'labor dispute' in this case in which plaintiffs were involved, the District Court was not bound by the provisions of the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., but had power to grant the restraining order and we think it wisely exercised that power.

" * * * * * *

"In such a case as we have here, where the controlling and only question is which of two labor unions is the collective bargaining agent of the employees of the plaintiffs, and the employers take no part in such dispute, but, on the contrary, are willing to abide by the decision of the Board and

contract with the union it designates, it is manifest that the Board, and it alone, has jurisdiction to decide that question by an election and, as conceded at the argument, the court below had no power to order an election and to that extent its order is vacated; but on the question before us, whether or not we should grant a supersedeas of the injunctive order of the court, pending a decision by the Board as to what organization is the lawful bargaining agent of the plaintiffs' employees with which the plaintiffs must bargain, we think the supersedeas should be denied and the status in quo preserved until the Board acts. Such denial will prevent irreparable injury to the plaintiffs and the ruin of its business and at the same time do little, if any, harm to defendants." (Italics ours.)

*Union Premier Food Stores, Inc., et al. v. Retail Food Clerks and Managers Union et al.,* supra. Decision affirmed, 101 F2d 475; certiorari granted, 307 US 619, 83 L ed 1498, 59 Sup Ct 1032; case dismissed as moot, 308 US 526, 84 L ed 445, 60 Sup Ct 376.

■ Where picketing is for an unlawful purpose, no "labor dispute" exists within the meaning of Oregon's anti-injunction act. § 102-906 et seq., OCLA. In *Peters v. Central Labor Council,* supra, 179 Or 9, this court said:

"We agree with appellants that picketing, even though peacefully conducted, ought to be enjoined if it is for an unlawful purpose. Ever since the enactment of the Anti-Injunction Act, this court has consistently held that picketing must be for a lawful purpose. Starr v. Laundry Union, 155 Or. 634, 63 P. (2d) 1104; Wallace v. International Ass'n of Mechanics, supra; Schwab v. Moving Picture Operators, 165 Or. 602, 109 P. (2d) 600; Markham & International Woodworkers, 171 Or. 13, 135 P. (2d) 759. There is no decision of the United States Supreme Court to the contrary. The court, in

Dorchy v. Kansas, 272 U. S. 306, 71 L. Ed. 248, 47 S. Ct. 86, said: '* * * a strike may be illegal because of its purpose, however orderly the manner in which it is conducted.' It is significant that in those cases where the Supreme Court identified picketing with free speech no unlawful purpose of the picketing was involved. That courts may take into consideration the purpose of the picketing is established by the great weight of authority. See cases collated in note 116 A. L. R. 501. Also see Teller on Labor Disputes, Vol. I, § 114. Some courts, however, refuse to enjoin picketing even if it is for an unlawful purpose. Wilson & Co. v. Birl, 27 F. Supp. 915. In our opinion, the Norris-LaGuardia Act—which concerns procedural rights —was never intended to make lawful that which was unlawful before its enactment. Neither do we believe that free speech is involved where the labor objective is illegal. R. H. White Co. v. Murphy, 310 Mass. 510, 38 N. E. (2d) 685. Even free speech has its limitations. Carpenters and Joiners Union v. Ritter's Cafe, 315 U. S. 722, 86 L. Ed. 1143, 62 S. Ct. 807."

If the plaintiff Tidewater enters into a contract with the defendant unions, either voluntarily or as a result of the present picketing, such contract, as we have heretofore observed, would be unlawful and would constitute an unfair labor practice within the meaning of § 158(a) (1) of the Act of 1947, and Tidewater would thereby inject itself into a labor dispute.

Court restraint of picketing designed to force plaintiff to enter a labor dispute to which it is not a party is not an injunction "involving or growing out of a labor dispute." § 102-916, OCLA. The Little Norris-LaGuardia Act of this state was not designed to deprive this court of jurisdiction, duty and right to enjoin picketing which has for its sole purpose coercion of the primary employer to do that which the National

Labor Relations Act forbids it to do, particularly when the manner of that picketing by the offending unions in and of itself constitutes an illegal labor practice under the federal act. In *Oberman & Co., Inc. v. United Garment Workers of America et al.,* 21 F Supp 20, 27, the court cogently observed:

"As was said in Virginian Ry. Co. v. System Federation No. 40, supra, 300 U. S. 515, loc. cit. 552, 57 S. Ct. 592, 601, 81 L. Ed. 789: 'Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved. * * * The fact that Congress has indicated its purpose to make negotiation obligatory is in itself a declaration of public interest and policy which should be persuasive in inducing courts to give relief.' "

To this we add that not only has Congress made negotiation obligatory as a matter of public policy but since that decision it has, by the Act of 1947, made the picketing, as carried on by the defendant unions in the instant matter, an unfair labor practice which is also in and of itself an unlawful act (§ 158(b) (4) (B) of the Act of 1947) and subject to the injunctive process specifically provided for in § 160 (*l*) of the same Act, when petitioned for in a district court of the United States by an authorized officer of the National Labor Relations Board.

It would be anomalous under the circumstances present here to say that a labor dispute exists merely because a union is unwilling to await a ruling from the National Labor Relations Board fixing a time for the election of a bargaining representative by plaintiff's employees, especially when, as a result of its illegal labor practice, it places the employer in the dilemma in which the plaintiff Tidewater now finds

itself. If plaintiff accedes to the demands of the defendant unions, it violates the Act of 1947. If it attempts to abide by the mandates of that Act, it has to suffer picketing and all that goes with it.

■ In summary of what we have heretofore said, we find that the alternative writ reveals that the defendant unions' acts are not only unlawful as illegal labor practices under the Act of 1947 but are also illegal as violative of the public policy of Oregon and, insofar as they are presently active on the premises of Permanente, constitute a secondary boycott. Under such circumstances a court of equity should prevent the irreparable injury that flows from the conduct of the offending unions, unless it can be said that Congress, by the Act of 1947, has so pre-empted the field that the state courts must remain inactive and silent.

The case of *Building Service Employees International Union, Local 262 et al. v. Gazzam*, 339 US 532, 94 L ed 1047, 70 Sup Ct 784, decided May 8, 1950, on certiorari to the Supreme Court of the state of Washington, goes far to destroy the claim of the defendant unions that a state court is without right to restrain union action of the character disclosed by the record under examination in the case at bar. In that case the respondent hotel keeper employed about 15 persons in an inn which he operated in Bremerton, Washington. He was importuned by the representatives of the union to sign a contract with the union which would, among other things, designate it as the employees' authorized bargaining representative. None of his employees were members of any union active in the area of their employment. The opinion does not disclose the existence of a labor dispute between the employer and his employees. As a result of nego-

tiations between the inn keeper and the union, an informal election was had to determine whether or not the hotel employees desired to join the union. Eleven employees voted—nine were against joining, one was undecided, and a bellboy whose membership the union did not desire voted to join. The union insisted that the employer sign a contract notwithstanding, but the employer declined to sign on the ground that to do so would require him to coerce his employees to join a union contrary to state law. The election was followed by a notification that the hotel had been placed on the union's "We Do Not Patronize" list and pickets began walking in front of the hotel bearing a placard reading: "Enetai Inn—Unfair to Organized Labor." This in turn was followed by the hotel employer's suit in the courts of the state of Washington, resulting in an injunction enjoining the union "from endeavoring to compel plaintiff to coerce his employees to join the defendant union or to designate defendant union as their representative for collective bargaining, by picketing the hotel premises of plaintiff   *   *   *." The Supreme Court of Washington affirmed (34 Wash 2d 38, 207 P2d 699) and the Supreme Court of the United States thereafter granted certiorari. No labor dispute as determined by the law of Washington was held to exist in that case. There was no injunction against picketing generally. The Supreme Court of that state held that the objective of the picketing was violative of the public policy of that state which inhibited employer coercion of employees' choice of a bargaining representative. The Supreme Court of the United States in affirming the action of the state court said at page 537 et seq.:

"The public policy of any state is to be found in its constitution, acts of the legislature, and de-

cisions of its courts. 'Primary it is for the law-makers to determine the public policy of the State.' Twin City Pipe Line Company v. Harding Glass Company, 283 U. S. 353, 357.

"* * * Picketing of an employer to compel him to coerce his employees' choice of a bargaining representative is an attempt to induce a transgression of this policy, and the State here restrained the advocates of such transgression from further action with like aim. To judge the wisdom of such policy is not for us; ours is but to determine whether a restraint of picketing in reliance on the policy is an unwarranted encroachment upon rights protected from state abridgment by the Fourteenth Amendment.

"Petitioners insist that the Swing case, supra, is controlling. We think not. In that case this Court struck down the State's restraint of picketing based solely on the absence of an employer-employee relationship. An adequate basis for the instant decree is the unlawful objective of the picketing, namely, coercion by the employer of the employees' selection of a bargaining representative. Peaceful picketing for any lawful purpose is not prohibited by the decree under review. The State has not here, as in Swing, relied on the absence of an employer-employee relationship. Thus the State has not, as was the case there, excluded 'workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him.' 312 U. S. at 326.

"The Washington statute has not been construed by the Washington courts in this case to prohibit picketing of workers by other workers. The construction of the statute which we are reviewing only prohibits coercion of workers by employers * * *.

"We are of the opinion that Giboney v. Empire Storage & Ice Co., 336 U. S. 490, controls the dis-

position of this case, and that it therefore must be affirmed * * *.

"Here, as in Giboney, the union was using its economic power with that of its allies to compel respondent to abide by union policy rather than by the declared policy of the State. That state policy guarantees workers free choice of representatives for bargaining purposes. If respondent had complied with petitioners' demands and had signed one of the tendered contracts and lived up to its terms, he would have thereby coerced his employees. The employees would have had no free choice as to whether they wished to organize or what union would be their representative.

"The public policy of Washington relied upon by the courts below to sustain this injunction is an important and widely accepted one. The broad purpose of the Act from which this policy flows was to prevent unreasonable judicial interference with legitimate objectives of workers. But abuse by workers or organizations of workers of the declared public policy of such an Act is no more to be condoned than violation of prohibitions against judicial interference with certain activities of workers. We therefore find no unwarranted restraint of picketing here * * *."

We now turn to a consideration of the last question to which our foregoing observations necessarily give rise and the answer to which will be conclusive on plaintiff's rights in this matter, that is, whether or not, as claimed by defendant unions, there has been a

### Congressional Pre-emption

in the field of labor relations so as to completely exclude any action by the courts of Oregon by way of relief to the situation in which the plaintiff Tidewater presently finds itself.

This brings us to a consideration of a phase of the matter which the defendant unions denominate as the

only issue before this court, i.e., whether or not the lower court was correct in refusing to take jurisdiction upon the ground that the federal government under and by virtue of the Act of 1947 has, under the commerce clause of the Constitution of the United States, pre-empted the field of labor relations to the exclusion of all action on the part of the state.

We do not find it necessary under what is disclosed by the record before us to embark upon an extended inquiry to determine, if we could, with legal preciseness exactly the limits of federal interest and control in that shadowy field of uncertainty, nor where and when, indeed, the states must retire and relinquish any claim of sovereign authority to protect the persons and property of their own citizens. Here we find a legislative "no-man's land", so to speak, in which citizens of our state are momentarily in jeopardy without the protection of law and without adequate legal procedures to protect their property from dissipation by the temporarily uncontrolled acts of other persons, contrary to the peace, dignity and public policy of this commonwealth.

It is the duty of the courts to shorten that moment of uncertainty and insecurity if they can with propriety do so. As we approach this phase of the overall problem, we are governed by that fundamental principle common to our whole system of American and English jurisprudence: Equity will not suffer a wrong without a remedy. Even the common law has a rule in near counterpart: Where law is, there is a remedy *(ubi jus, ibi remedium)*. In a case made appropriate by the facts, equity looks to the substance and not the shadow, to the spirit and not the letter. Equity seeks justice rather than technicality, truth rather than evasion, common sense rather than quibbling. *State v.*

*Tyler County State Bank,* (Tex), 282 SW 211, 45 ALR 1483, 1484.

We orient our thought by first examining that part of the Act of 1947 declaring the Congressional object and purposes. It is, indeed, high and worthy. It is found in § 141(b) where it reads:

"It is the purpose and policy of this chapter, in order to promote the full flow of commerce, to prescribe the legitimate rights of both employees and employers in their relations affecting commerce, *to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other,* to protect the rights of individual employees in their relations with labor organizations whose activities affect commerce, to define and proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce." (Italics ours.)

In this connection it is well to read a further statement of policy found in § 151:

"It is declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection * * *."

In order to effectuate the end sought to be attained by § 141(b) of the Act, Congress included certain specific procedures. They are found in § 160, from which we take the following:

"(a) The Board is empowered, as hereinafter

provided, to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise  *  *  *.

"(b) Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect  *  *  *.

"*  *  *  *  *

"(j) The Board shall have power, *upon issuance of a complaint as provided in subsection (b)* of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any district court of the United States (including the District Court of the United States for the District of Columbia), within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order  *  *  *." (Italics ours.)

Section 160 taken in its entirety bespeaks a Congressional intent that the remedies therein provided should be applied with effective and sufficient speed in order that the purposes and objects of the legislation be accomplished and not be defeated by delay. Indeed, this conclusion is given special emphasis by subsection (*l*) of § 160, where it is provided:

"Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (A), (B), or (C) of section 158(b) of this title, *the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed* or to

which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any district court of the United States (including the District Court of the United States for the District of Columbia) within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter   *   *   *."

The power of injunctive relief is there recognized and provided for in the first instance, as here, in the nature of a restraining order *pendente lite*. It is an emergency remedy and, like all extraordinary remedies when appropriate, contemplates speed in request and speed in execution of the order or writ, if granted. Its character and function are well defined by 28 Am Jur, Injunctions, 207, § 14:

"The controlling reason for the existence of the judicial power to issue a temporary injunction is that the court may thereby prevent a threatened or a continuous irremediable injury to some of the parties before their claims can be thoroughly investigated and advisedly adjudicated. It is to be resorted to only when there is a pressing necessity to avoid injurious consequences which cannot be remedied under any standard of compensation. The application for a temporary injunction rests upon an alleged existence of an emergency, or of a special reason for such an order, before the case can be regularly heard, and the essential conditions for granting such temporary injunctive relief are that the complaint allege facts which appear to be sufficient to constitute a cause of action for injunction, and that on the entire showing from both sides it appear, in view of all the circumstances, that the

injunction is reasonably necessary to protect the legal rights of the plaintiff pending the litigation * * * ".

Conceding for the moment that the National Labor Relations Board has exclusive jurisdiction of the controversy between Tidewater and the defendant unions (as the plaintiff very evidently thought it did when it addressed its inquiry eliciting the response hereinafter referred to), it was to be expected, as no doubt the Congress expected and intended, that the Board would act with the alacrity the record before us seems to warrant and would (1) forthwith give the charges "priority over all other cases except cases of like character in the office where it [the charge] is filed" (§160(*l*)) and (2) hasten the issuance of a complaint and, upon its issuance, petition without delay for the injunctive relief contemplated by § 160(j).

Evidently in response to plaintiff's inquiry made by Alex L. Parks, one of its counsel, relative to the speed with which a petition for injunctive relief might be filed, the following answer was received:

"FROM NLRB, SEATTLE WASHINGTON FILED 4-21-52 AT 5:05 P.M. ADDRESSED TO A. L. PARKS, 1100 JACKSON TOWER, PORTLAND, OREGON.

"TEXT:

"RE YOUR INQUIRY WHEN CHARGE FILED UNDER SECTION 8(b)4 [§ 158(b) (4) USCA] OF ACT AND IF AFTER INVESTIGATION WE DEEM CHARGE MERITORIOUS A FEW WEEKS WOULD PROBABLY ELAPSE BETWEEN TIME OF FILING AND OUR APPLICATION TO FEDERAL DISTRICT COURT FOR RESTRAINING ORDER

"SIGNED: THOMAS P. GRAHAM, DIRECTOR NLRB, 407 U.S. COURTHOUSE SEATTLE, WASHINGTON".

We assume that the title "DIRECTOR NLRB" refers to Regional Director, an appointive official of the Board authorized by § 154(a).

We, of course, do not know the reasons justifying such a delay, if any can be given for thus frustrating the objects and purposes of the Act of 1947 delineated in §§ 141(b) and 151. In view of the provisions of the Act (§ 160) mandating speed and preferential status for charges made under § 158(b) (4), the reply of the Director confessing and promising a long period of inaction and delay is as surprisingly disappointing as it would be to have a sheriff advise that he was making no criminal arrests until he had more vacant cells in the jail. Each suggests the suspension of emergency remedies contrary to the spirit and letter of the law.

Notwithstanding the foregoing message, defendants in their brief argue that the plaintiff must first exhaust its remedies under the Act of 1947.

If we adopt defendants' theory of exclusive federal jurisdiction in this matter, Tidewater will have no recourse but to stand idly by for an indeterminate period during the Board's investigation of its charge brought under § 160(a) and thereafter for a "few weeks" more while the Board decides whether or not to petition the United States district court for a restraining order. Meanwhile, plaintiff will be suffering losses at the rate of not less than $5,000 a day, all as a result of the actions of the defendant unions, constituting, as they do, an illegal labor practice under the federal Act of 1947 and without exoneration as a "labor dispute" under the Oregon law.

We are unable to believe that the Congress ever intended that such an intolerable situation should exist

without remedy. To hold otherwise would give such recognition to a legislative hiatus between federal and state law that would thereby create a sort of judicial island in our national life untouched by either Congressional or state statute, a sanctuary to which the offending unions might safely repair with complete immunity while holding and harassing plaintiff and its business, or vice versa, a haven of protection wherein the employer might find refuge to unjustly and illegally exploit his employees to their detriment or labor organizations to their destruction. Such is not consonant with the public policy of any state so far as we are advised, nor have we discovered any federal sanctions for such a practice. When any group, whether it be one of employer or employees, can find such a refuge beyond the reach of judicial control, we jeopardize our fundamental concepts of law and order and lay the foundation for privileged classes, inimical to the most cherished ideas of equal justice for all.

█ When the National Labor Relations Board is impotent by its own confession to implement immediate aid, then we believe it is appropriate and necessary that our courts of equity take jurisdiction and apply such remedies as a hearing on the facts seems to dictate.

The idea is not novel. It finds recognition and approval in principle in *Bethlehem Steel Co. et al. v. New York State Labor Relations Board,* 330 US 767, 773, 91 L ed 1234, 67 Sup Ct 1026, where it is said:

"In other cases, Congress has passed statutes which initiate regulation of certain activities, but where effective regulation must wait upon the issuance of rules by an administrative body. In the interval before those rules are established, this

Court has usually held that the police power of the state may be exercised  *   *   *."

We are unable to discover any persuasive distinction between an administrative body whose functions are rendered dormant by reason of its failure to issue implementing rules and regulations and an administrative body whose emergency functions are rendered impotent by causes unknown, particularly when declared in terms of delay which would defeat the remedies sought to be achieved through the agency confessing its own functional paralysis.

*Montgomery Building & Construction Trades Council et al. v. Ledbetter Erection Co., Inc.,* (Ala), 57 S2d 112, is a very recent case (January 10, 1952) wherein injunctive relief was granted by the state of Alabama under a set of facts very similar to the case at bar where it was sought to restrain a labor union from illegal labor practices as defined by § 158(b) of the Act of 1947. The contention was made there, as here, that the National Labor Relations Board had exclusive jurisdiction. The Supreme Court of that state sustained the injunction on the theory that the courts of that state were the only agency where the employer could get quick and adequate relief from the irreparable damage which the continued picketing by the union threatened. In so holding on the rehearing, the court said at page 122:

"The only question we have in this case is whether the State court has jurisdiction when special circumstances of irreparable injury are alleged and not controverted, augmented by the necessary time of the board in making the preliminary investigation, and subject to a possibility that that board will not take jurisdiction on account of the small amount of influence the transaction has on the flow of interstate commerce. This being in

the discretion of the board, it was not necessary for complainant to take that risk in a situation which was then holding up construction and causing irreparable damage. National Labor Relations Board v. Denver Building and Construction Trades Council, supra (4), 341 U.S. 675, 71 S. Ct. at pages 949, 950, 71 L.Ed. 1284 * * *.

"Considering that release and the urgency of the need for an immediate injunction to prevent irreparable damage, we still think a state court of equity was open to complainant. No other court had jurisdiction. The only other remedy was before the board. We think the authorities support the view that a state court of equity has jurisdiction upon a showing of extraordinary circumstances or irreparable injury."

██ No court of this state can issue an injunction which will have the effect of hindering proceedings pending before the National Labor Relations Board. *Oregon Shipbuilding Corp. et al. v. NLRB et al.*, 49 F Supp 386 (D.Or. 1943). No state court can enjoin any party from invoking the jurisdiction of the National Labor Relations Board and the remedies accorded by the Act of 1947; but if the lower court should, after hearing, find plaintiff entitled to injunctive relief prayed for in the matter, such injunction would not be an attempted restraint upon or in derogation of the authority and power which the Congress conferred upon the National Labor Relations Board but, to the contrary and as ancillary to the administration of justice, in recognition and in aid of its authority by preserving the situation of the parties in statu quo until the Board had time and opportunity to implement the processes made available to it by § 160. No substantive right conferred by the Act of 1947 would be impaired by the injunctive relief sought in the lower court. A proper order of restraint would not trespass the legis-

lative territory claimed by Congress but would compel respect for the Congressional intent and purpose as well as the public policy of this state. The concept of ancillary aid by one court in aid of another or even a quasi-judicial tribunal is not unique in our system of jurisprudence. 28 Am Jur, Injunctions, 210, § 16; 43 CJS, Injunctions, 420, § 13.

■ In the Gazzam case, supra, (339 US 532) the appeals were taken from an injunction then in force and effect. Here no injunctive relief has been granted and after hearing none may ever be given. In this court and in this proceeding we are limited to a consideration of the facts found in the record before us, consisting as it does of the pleadings, exhibits and affidavits heretofore referred to, and which, by reason of defendants' demurrer to the writ, we are bounden to assume to be true. What might be revealed in the lower court on hearing may contradict the factual representations of these documents in every material particular. Nothing herein said concerning the facts as disclosed by the record which limits our examination should be construed to the prejudice of what either the plaintiff Tidewater or the defendant unions may be able to adduce at trial time. Indeed, on hearing, the evidence of the defendants may well preponderate against the claims and assertions of the plaintiff. Here we determine only the right and duty of the circuit court to take jurisdiction of plaintiff's claim for relief, in whole or in part, as revealed by what is before us. What relief, if any, is accorded to plaintiff after a hearing rests in the sound discretion of the trial judge.

■ It is ordered that a peremptory writ of mandamus issue.